CASE 104—ACTION FOR INJURY CAUSING DEATH—NOVEMBER 28.

# Hughes' Administrator v. Louisville & Nashville R. R. Co.

APPEAL FROM JEFFERSON CIRCUIT COURT, COMMON PLEAS DIVISION.

1. NEGLIGENCE—PEREMPTORY INSTRUCTION.—In an action for negligence causing the death of plaintiff's intestate, a brakeman on defendant's freight train, it appeared that the decedent after going to the top of the caboose to remove a lantern was, in some manner, knocked from the ladder on the side of the caboose and killed. The body was found on the track of the railroad where it crossed a bridge whose girders were some seventeen inches from the ladder of the caboose. A strip of the intestate's trousers about four inches long was found on the bridge and some lint from his clothes was found adhering to the girder. Under these facts it is held that the question of defendant's negligence should have been submitted to the jury.

2. SAME—EVIDENCE.—Statement made by brakeman after the train had run a mile and a half and the brakeman had returned to the bridge, that the decedent had been knocked from the train is not competent as part of the *res gestae*.

3. SAME.—So the statement that the conductor had said immediately after the train had stopped that the bridge "got him," being a mere matter of opinion, is not competent as part of the *res gestae*.

MATT. O'DOHERTY FOR APPELLANT.

LYTTLETON COOKE FOR APPELLEE.

(Transcript and briefs withdrawn from the clerk's office.)

JUDGE PAYNTER DELIVERED THE OPINION OF THE COURT.

In September, 1894, the deceased, Ollie T. Hughes, was a brakeman on a freight train going South from Louisville. Immediately after leaving Belmont, and just after daylight, he as his duties required, left the caboose, and went

up on top of it to remove a deck lantern. There were iron ladders on each side of it at the rear end. After getting the lantern, he started to go down the ladder provided for that purpose on the west side of the caboose, and whilst descending it, it is claimed, he was struck by the girders of the bridge over which the train was passing, and thrown from the caboose to the track, causing injuries which resulted in his death a month thereafter. The court instructed the jury to return a verdict for the defendant; so the question presented is whether the case should have gone to the jury.

It is claimed that the bridge was not constructed in a way that made it reasonably safe for the deceased to discharge his duties, and that by reason thereof he lost his life. On the other hand, this is denied by the appellee, and it is claimed that, if it was not so constructed, the deceased was presumed to know its condition, and that his contract of employment required him to take the risk; and, further, that the evidence failed to show that the injury was the result of the negligence of the appellee. Testimony was offered by the plaintiff tending to show that the space through which the train passed, between the girders of the bridge, was twelve feet, whilst one of the witnesses for the defendant testified that the space was slightly less than twelve feet. There was testimony tending to prove that the caboose (from which the deceased fell), including the ladders, was something over nine feet wide, leaving the space between the ladder and the inner edge of the girder about seventeen inches. There is testimony tending to prove that, after the deceased got on top of the caboose and procured the lantern, he started down the ladder, and, when last seen, part of his body was over the side of the caboose, descending the ladder, when a

crash was heard as from the breaking of glass, and the conductor looked out of the window, and saw him lying across the track in the rear of the moving train. No one saw him at the instant he fell; hence there is no witness to describe the exact manner of the fall from the caboose, or what caused it. There is testimony tending to prove that a man in the act of descending the ladder, and in that position, while passing through the bridge, would probably be struck by it. This is the testimony of an experienced brakeman, who is familiar with trains and also the bridge in question. In fact, there is no testimony in the record which tends to show that he was not in a perilous position in going down the ladder whilst crossing the bridge. The evidence also tends to prove that the intestate's leg was injured; that a narrow strip about four inches long, torn from his trousers, was found on the bridge; and also some lint from his clothes was found adhering to the girder of the bridge.

It is argued that, under the decisions of this court, it was necessary for the plaintiff to have offered testimony showing that the death of the deceased was the result of the negligence of the appellee. This is true. It is also argued by counsel for appellee that there is a failure to show that it was guilty of such negligence as to make it liable for the injury. To support that contention, among other cases are cited Wintuska's Adm'r v. Louisville & Nashville Railroad Co., 14 Ky. Law Rep., 580 [20 S. W., 819]; Nance's Adm'r v. N. N. & M. V. R. Co., 13 Ky. Law Rep., 557 [17 S. W., 570]; Hughes v. Cin., etc., Railroad Co., 91 Ky., 526 [16 S. W., 275]. It was held in the *Hughes case* that one suing to recover damages for injury arising from another's neglect must offer some testimony showing that the party complaining was injured,

and also introduce some testimony tending to show the other party is to blame for it, as negligence can not be presumed. The court held in that case that the evidence did not tend to establish the fact that he had been struck by a loose overhanging timber in one of the tunnels; and that, if he was killed in going through another tunnel, he could not recover, because brakemen were required to sit or lie down by the brakes, as it was customary for them to do in passing through the tunnels. It was claimed in the *Wintuska case* that the deceased was killed in going down the ladder at the side of a box car, with the view of going to a flat car in front of it, and in doing so he came in contact with a ledge of rocks. The court held the company was perhaps guilty of negligence in allowing the rocks to project so near the passing trains, but unless this caused the accident to the deceased, a recovery could not be had on account of it. The court concluded, from the testimony in that case, that the evidence was not sufficient to authorize the jury to reach the conclusion that he had been killed be coming in contact with that rock. There was no evidence tending to show that there was any lint from the cloths of the deceased on the rock; neither was there a strip torn from his trousers llying below the rock, nor was there any evidence that he fell from the laddr. Had there been, probably the court would not have held that there was not evidence sufficient to have alllowed the jury to pass upon the question as to whether the deceased had been killed by coming in contact with the projecting rock. The deceased, Hughes, seemed to have been in good health. Nothing is made to appear indicating that he might have had an attack of vertigo, a possibility suggested in a speculation as to the cause of the accident. He was seen in the act of descending the steps, and to be in that position under the circumstances

and conditions proven indicates that reasonable men might conclude that he came in contact with the girder of the bridge, and was thus thrown from his position, inflicting injuries from which he died. At any rate, the jurors should be the judges of the facts and circumstances proven, and they should be allowed to determine from them as to whether or not the negligence of the appellee caused the death of the deceased. In the case of Cin. etc. R. R. Co. v. Sampson's Adm'r, 97 Ky., 70, [30 S. W., 13], the court said: "The employe assumes the ordinary risks pertaining to an employment that is often and necessarily attended with much danger, but this does not exempt the railroad company from liability when reasonable precaution on its part would save its employes from harm, and in a case like this, where the exercise of the slightest care would have prevented the accident. There can be and has been no reason assigned in this case why a corporation with the means to construct a railway would, in the construction of small or large bridges, leave them in such a condition as involves its employes, brakemen, in imminent peril when passing through them, when, with a small expenditure, such structures in this regard could be made perfectly safe. We are aware of many reported cases, some of which have been referred to by counsel, where the absence of ordinary care and the means of knowing the condition of the bridge by the employe have been held as relieving the railway company from responsibility in such cases. This court, however, has not followed or approved those decisions in reference to such structures, but, on the contrary, in the case of Derby's Adm'r v. The Kentucky Central Railroad Co., 9 Ky. Law Rep., 153 [4 S. W.,303], plainly intimated that, if the intestate in that case had been required to be on top of the car as it passed through

the structure in discharge of his duty, and was killed by
reason of its being too low for the cars to pass under, the
brakeman standing erect upon them, a recovery would
have followed." In the case of Derby's Adm'r v. Kentucky
Central Railroad Co., 9 Ky. Law Rep., 153 [4 S. W., 303],
the court said: "We think the rule is that railroad
companies are not bound to furnish appliances ab-
solutely safe, but that they must use reasonable care
to provide such as are reasonably adequate and safe
for the use of their employes. The latter, in accepting
the employment, assume all the ordinary risks of the busi-
ness; but, if engaged in operating the trains, they can not
well know, and it is not a part of their business to ascer-
tain, the condition of the appliances in use, unless they
are immediately under their care and subject to their
control. They do not contract with reference to them.
Thus a brakeman has a right to rely upon the company
using reasonable care in providing a safe track. He has
no opportunity to inspect it; it is not a part of his busi-
ness: and unless he, in fact, knows of its defective con-
dition, and recklessly exposes himself to the danger, he is
not chargeable with neglect. The master can not place
an additional or extra risk upon the servant without no-
tice to him." Inthe case of Bogenschutz v. Smith, 84 Ky.,
339 [1 S. W., 580], the court said: "Thus, it is, in general,
no part of the duty of a brakeman to inspect the track of
a railway or to know that it has been safely constructed.
The master may have superor means of knowledge, and
the circumstances may authorize the servant to rely on
him because of want of equal opportunity. The servant
may be ignorant without fault, while the master is negli-
gently so."

The court should have submitted the question to the
jury as to whether the injury which resulted in the death

of the deceased was caused by the negligence of the appellee.

The plaintiff introduced George and J. F. Collins in chief to prove that a brakeman on the train from which Hughes fell said he (Hughes) had been knocked off of the train. These witnesses claim that this statement was made at the bridge, after the train had run about one mile and a half and the brakeman had returned to the bridge. The Collins' also said that the brakeman notified them at a point about a mile from the bridge that a man had *fallen off, or had been knocked off* of the train. These statements are not a part of the *res gestae*, and therefore are inadmissible as evidence. L. & N. R. R. Co. v. Ellis' Adm'r, 97 Ky., 343 [30 S. W., 979]. This testimony was not offered to contradict the brakeman, and, if it had been, it was inadmissible, because the brakeman did not testify that Hughes had not been knocked off by the bridge, and his testimony did not tend to show that he had not been knocked off by the bridge.

The testimony of Morehead that Coffey, the conductor of the train, said, immediately after it had stopped, the bridge "got him," is inadmissible as part of the *res gestae*, as it was a mere expression of opinion of Coffey, not a statement that he saw him knocked off of the train by the bridge. Coffey testified that he did not see Hughes fall. He did not pretend to have any knowledge as to Hughes' position at the time he did or what caused him to fall.