## L. & N. R. R. Co, v. Roe, By, et al.

(Decided February 24, 1911.)

### Appeal from Whitley Circuit Court.

1. Instruction—Right to Peremptory.—Where a railroad freight brakeman was knocked from the top of a box car and injured by an over-head tunnel-gauge situated half a mile from the tunnel and unprotected by a "telltale" or other device to notify the brakeman of the presence of the tunnel gauge, the trial court did not err in overruling defendant's motion for a peremptory instruction.

2. Same—Damages.—Where the damages awarded are not more than strict compensation, the verdict will not be set aside, although the jury were instructed that they might, in their discretion, award punitive damages if they found the negligence was gross.

3. Instructions—To be Read as a Whole.—An instruction must be read as a whole; and if, when so considered, it fairly and fully

presents the question at issue to the jury, their verdict will not be disturbed.

H. H. TYE, J. W. ALCORN, CHAS. H. MOORMAN and BENJ. D. WARFIELD for appellant.

J. N. SHARP for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

The appellee, Roe, aged nineteen and a freight brakeman in the employment of the appellant Railroad Company, was injured on September 13th, 1907, while in the discharge of his duties near Solway, Tennessee, immediately north of the "Copper Ridge Tunnel."

On April 1907, an accident in the tunnel had resulted in a caving in of about 319 feet of the tunnel, thereby closing it for that distance and rendering it unfit for the use of appellant's trains. It was not until June 20th, 1907, that appellant succeeded in clearing the tunnel so that it could be used by its trains; and during the period between April 21st, 1907, and June 20th of that year, appellant used the tracks of the Southern Railway Company over a different route. By June 20th the debris had been removed from the tunnel, and it was again used for the passage of appellant's trains. It was necessary however, that the tunnel should be made safe for future use; and with that purpose in view, the appellant put a force of from 50 to 75 men at work enlarging the tunnel opening through the mountain and putting in a concrete lining in place of the timber lining that had theretofore supported the opening. It was considered that the concrete lining was to be preferred, both on account of its strength and durability and the elimination of the danger from fire. This work took about three months, and was not completed until about September 28th, 1907. During the time the improvements were being made in the tunnel, appellant sent about 25 trains through the tunnel every day. In order to carry on the work, scaffolding and other appliances used in that character of work were erected in the tunnel; and this necessarily reduced the space therein which would ordinarily be used for the trains. The timbers were so arranged as to leave sufficient space only to permit cars of ordinary size to pass through the tunnel; and in order to guard against sending into the tunnel cars that were too large to pass safely through the opening while the

scaffolding was there, a tunnel-gauge was constructed about a half-mile distant from each opening of the tunnel. These gauges were constructed by placing poles upon either side of the track, and by placing over the track and attached to the poles, light pieces of timber that would leave a space in width and height on the sides of and above the track that was equal to the open space left between the timber in the tunnel through which the cars would pass. In this way it was easy to determine when a car was too large to go through the tunnel without striking the scaffolding; for, if the car either by its great width, or its height, would strike the side or top of the tunnel-gauge, either of those facts would show that the car was too large to pass safely through the tunnel; and it would then be cut out of the train and sent back. The tunnel was about 2,300 feet in length, and this precaution was necessary for the protection of the men at work inside of the tunnel.

Roe was front brakeman on a north-bound freight train, composed of from 30 to 35 cars. After the train had passed through the southern tunnel-gauge and through the tunnel, it went on to a side track just north of the tunnel for the purpose of permitting a south-bound train to pass. After the south-bound train had passed, Roe's train started north, and he threw the switch that let his train pass on to the main track. He then climbed back to the top of a box car, and walked back to the fourth car for the purpose of transmitting to the engineer the signals that were expected from the flagman when the rear end of the train had passed from the switch to the main track. When that was accomplished, it was necessary for the flagman to throw the switch, lock it, and get back on to the train; and as it required from one to two minutes for this to be done, the train was required to slow up in order that the flagman might regain the train. At this point the track curved to such an extent that the engineer could not see the flagman; and it was necessary for Roe, being the front brakeman, to pass the signals from the flagman to the engineer. While Roe was standing or walking along upon the top of the fourth box car, looking southwardly for the signal from the flagman, and with his back toward the engine, the car passed under the tunnel-gauge and knocked him off, and on to a gondola car which was the next car in the train. His right arm was

broken near the wrist, his face was bruised, his knee was hurt, and, it is claimed, that his hearing in one ear has been permanently injured. He sued the company and recovered a verdict for $2,600.00, and from the judgment upon that verdict the company appeals.

The grounds relied upon by the appellant for a reversal are: (1) that the trial court erred in not sustaining appellant's motion for an instruction peremptorily directing the jury to find for it; (2) that the damages are grossly excessive, due, as it is claimed, to an instruction which authorized the jury to award punitive damages in addition to compensatory damages; and (3) that the court erred in instructing the jury, and also in refusing to give instructions asked by appellant.

The argument for a peremptory instruction for the appellant is based principally upon the fact that Roe had been working for appellant for a year; that the gauge was in full view of persons on the train; that appellee was an experienced brakeman; and further, that he knew of the existence of the tunnel-gauge that struck him and caused the injury. It is true, Roe had been working for appellant for about a year as a brakeman on freight trains which passed through the Copper Ridge Tunnel, but he had been sick and had laid off for some two weeks before he was hurt; and the train on which he was hurt was the first on which he worked after the gauge was erected. The only information that Roe had of the existence of the tunnel-gauge had been acquired a short time before the accident, while he was traveling over this route on the rear end of a passenger train, when his attention had been called to it by a fellow passenger. He saw it, but there is no evidence that he knew its size, the height of the top cross-piece of the gauge, or that he noticed its exact location with reference to the road. He says he did not know of the presence of the gauge at the time he was struck, and that no one had called his attention to it. The appellant contends, however, that notice had been given of the existence and location of the tunnel-gauge by bulletins posted upon the bulletin boards at the principal stations along the road, and it was Roe's duty under the rules of the company to read these bulletins for the purpose of protecting himself against injury from temporary obstructions which the company might find necessary to place along its track. Roe denies that he ever saw or read a bulletin in connection with the existence of this

tunnel-gauge, and there is no evidence beyond the fact that he saw it from the passenger train, above referred to, that he had ever seen or knew of it. The tunnel-gauge had been placed there for the protection of the tunnel and the men at work in the tunnel. Under this state of facts, was the company entitled to a peremptory instruction? The duty of the company is laid down as follows in 26 Cyc. 1130:

"A railway company is bound to exercise reasonable care and diligence to prevent obstructions or erections on, over, or near its tracks which are a source of danger to its servants, and will be held liable for injuries occasioned by its neglect of duty.

"If a railway company knowingly maintains or permits a bridge over its track so low that brakemen cannot perform their duties on the top of the cars with reasonable safety, it is liable to a brakeman who, having no knowledge of the dangerous character of the bridge, is struck by it and injured while in the performance of his duty.

"In the absence of a statutory requirement on the subject, the failure of a railway company to maintain whipping straps, telltales, or bridge guards to warn brakemen who are on top of a train that it is about to pass under a bridge so low as to imperil their lives is not legal negligence, unless such devices are so manifestly serviceable as to command the consensus of intelligent railroad men, and such men do not honestly differ in judgment as to their utility."

A tunnel-gauge, in construction and effect, is very similar to an over-head bridge, except that it is usually more dangerous to brakemen, since it generally leaves a smaller space above the top of the car. While a bridge may have any height above the top that convenience of construction may dictate, a tunnel-gauge, having been made for the purpose of measuring the contracted space within the tunnel, must necessarily be no larger than that contracted space. The question of a railroad's duty and liability to its employes in the construction of over-head bridges was carefully considered in Cincinnati, &c. R. Co. v. Sampson's Adm'r, 97 Ky. 65, where this court laid down the following rule as to the reciprocal rights and duties of the railroad company and its employes in cases of that character:

"The employe assumes the ordinary risks pertaining to an employment that is often and necessarily attend-

ed with much danger, but this does not exempt the railroad company from liability when reasonable precaution on its part would save its employe from harm, and in a case like this where the exercise of the slightest care would have prevented the accident. There can be and has been no reason assigned in this case why a corporation with the means to construct a railway would in the construction of small or large bridges, leave them in such a condition as involves its employes, brakemen, in imminent peril when passing through them, when with a small expenditure such structures in this regard could be made perfectly safe. We are aware of many reported cases, some of which have been referred to by counsel, where the absence of ordinary care and the means of knowing the condition of the bridge by the employe have been held as relieving the railway company from responsibility in such cases. This court, however, has not followed or approved those decisions in reference to such structures, but on the contrary in the case of Derby's Adm'r v. The Kentucky Central Railroad Company, 9 Ky. Law Rep., 153, plainly intimated that if the intestate in that case had been required to be on top of the car as it passed through the structure in discharge of his duty, and was killed by reason of it being too low for the cars to pass under, the brakeman standing erect upon them, a recovery would have followed. In that case the jury by their verdict said the structure was sufficiently high to enable one standing erect on the cars ordinarily used by the company to pass through safely, and the judgment for the defendant was affirmed, not only on the ground that the intestate knew the car he was on was too high for him to stand upon, but for the additional reason that he was master of the train and had made it up, placing in the train this high car that belonged to another road."

In Louisville & Nashville R. R. Co. v. Cooley's Admr, 20 Ky. Law Rep. 1372, Cooley was a brakeman on a freight train, and while sitting on the rear box car his head came in contact with the timbers of a bridge and he was instantly killed. In that case this court said:

"Without going into a discussion of the question, it is sufficient to say that it was negligence on the part of the company to have a bridge constructed as was this one. It was a constant peril to the lives of its employes whose duties called them on top of trains. When a brakeman's life is lost in consequence of such negligence the

company can not excuse itself by simply showing that he knew, before receiving the injury, the bridge was so low that he could not pass over it with safety while standing on top of the cars. Exigencies or other causes may arise in the discharge of his duties which may cause him to forget the danger with which he is threatened, and thus cause his failure to avoid injury.

"Cooley was killed on the first day he served as brakeman on the road between Paris and Maysville, and while appellant endeavored to show that he had knowledge of the location of the bridge and the danger attending passing over it, there is no evidence that he knew the exact distance from the top of the car to the overhead timbers. If he failed to measure the exact distance between the top of the car and bridge with his eye, or did so but failed, after reasonable effort, to get his body in an exact position to avoid a collision with the bridge, it seems to us that the appellant should suffer the loss and not the intestate's estate."

It will be seen that the Cooley case is, in its controlling facts, very similar to the case at bar, and in that case the court ruled that the trial judge properly submitted the question to the jury.

In Derby's Admr. v. The Kentucky Central R. R. Co., 9 Ky. Law Rep. 153, 155, Derby, a conductor, lost his life while walking on or descending from a box car on a train that was passing through an over-head bridge; and in considering the rights and duties of the master and servant under such circumstances, this court said:

"We think the rule is that railroad companies are not bound to furnish appliances absolutely safe, but that they must use reasonable care to provide such as are reasonably adequate and safe for the use of their employes.

"The latter, in accepting the employment, assume all the ordinary risks of the business; but if engaged in operating the trains, they can not well know, and it is not a part of their business to ascertain the condition of the appliances in use unless they are immediately under their care and subject to their control.

"They do not contract with reference to them. Thus a brakeman has a right to rely upon the company using reasonable care in providing a safe track. He has no opportunity to inspect it; it is not a part of his business and unless he, in fact, knows of its defective condition, and recklessly exposes himself to the danger, he is not

chargeable with neglect. The master can not place an additional or extra risk upon the servant without notice to him.''

The doctrine as announced in the Sampson case, supra, has been approved and followed by this court in Hughes' Adm'r. v. Louisville & Nashville R. R. Co., 104 Ky. 774; Finley v. Louisville Ry. Co., 31 Ky. Law Rep. 740, and Louisville & Nashville R. R. Co. v. Hahn's Adm'r, 135 Ky. 251.

Furthermore, it appears from the testimony of King, appellant's bridge supervisor, that a device known as a ''telltale'' could have been erected as a protection against danger from the tunnel-gauge, and at a reasonable expense. A ''telltale'' is made by erecting poles upon either side of the track, with an over-head connecting cross-bar from which several leather straps or ropes are hung at a distance that will show the open space in the bridge or tunnel through which the train is about to pass. If the straps touch the head of the brakeman while standing upon the car, he is thereby notified that the open space in the bridge or tunnel will strike his head, and that he must prepare for it. Some States have statutes requiring ''telltales'' to be erected to give warning of all over-head obstructions; and, although we have no statute upon that subject in Kentucky, we do not see why it is not a reasonable precaution that should be taken by a railroad company for the protection of its employes. This is particularly true in the case of a tunnel-gauge, which, by reason of its purpose, is necessarily more contracted as to size, and, therefore, probably fully as dangerous to the brakeman as a tunnel or an over-head bridge. We are of opinion, therefore, that the court properly overruled appellant's motion for a peremptory instruction.

The second objection is based upon the alleged error contained in the third instruction to the jury, which reads as follows:

''If you find for the plaintiff under instruction No. 1 above then you will give to him in your verdict what you may believe from the evidence to be a fair compensation for the mental and physical pain and suffering which he has endured by reason of his injuries, if any, and which you may believe from the evidence he will hereafter endure, if any, by reason of such injuries, including a fair compensation, according to the evidence, for any loss of time caused thereby and for

any loss of power to earn money caused thereby, including any diminution of his power to earn money in the future by reason of the permanency of his injuries, if you believe they are permanent, even though you may believe that such injuries were the result of the ordinary neglect or negligence of the defendant only; and if you shall further believe from the evidence that the plaintiff's injuries were caused by and were the result of the gross or wanton negligence of the defendant, as defined above in instruction No. 2, then you may, in your discretion, find any additional sum for the plaintiff by way of punitive damages or punishment for the injuries done to him as to you shall seem right and just from all the evidence, not exceeding in all, for the plaintiff, the sum of Fifteen Thousand Dollars ($15,000.00), the amount claimed in the petition."

It is claimed that the damages are grossly excessive and that the finding of the jury was brought about, or aggravated, by the clause in the above instruction which authorized the jury to award punitive damages. We are clearly of opinion, however, that this objection is not well founded, for the reason that the size of the verdict shows that it was not awarded as a punishment against the appellant. Where a young man nineteen years old has had his right wrist broken, and was otherwise bruised and injured, with his hearing probably permanently impaired, it can hardly be claimed that $2,600.00 is any more than compensation for his injuries, suffering, loss of time, and diminution of power to earn money in the future. In Illinois Central R. R. Co. v. Mayes, 142 Ky. 382, this court declined to reverse a judgment for damages for personal injuries where it appeared that the award was not more than strict compensation, although the jury had been instructed that they might, in their discretion, as was done here, award punitive damages, if they found the negligence was gross. We are of opinion that the verdict in this case comes within that rule.

It is further contended that, in using the words "and which you may believe from the evidence he will hereafter endure, if any, by reason of such injuries," in the third instruction, they should have been qualified so as to tell the jury that they could not award anything on account of future pain and suffering, unless it was reasonably certain that he would endure future pain and suffering. We think this criticism of the instruction is

hypercritical. The instruction as drawn, when fairly construed, carries the idea that the future pain and suffering should be reasonably certain in order to authorize the jury to award anything to the appellee upon that account.

It is also contended that instruction No. 3, which authorized the jury to find damages on account of future loss of time and loss of earning power, is open to the same objection, and also to the further objection that, as to the permanency of appellee's injuries, the instruction did not require the jury to believe "from the evidence" that the injuries were permanent, but authorized a recovery upon this ground "if you believe they are permanent." The instruction must be read as a whole; and, we conclude that when so read, it necessarily meant, and that the jury must have understood it to mean, that they could not return a verdict from any mere belief that they might have in the absence of evidence upon that subject. The instruction repeatedly required them to base their findings upon the evidence; and we are satisfied that the instruction as drawn was not prejudicial to the appellant.

The instructions given by the court fully covered the case, and it was not error to refuse the specific instructions asked by the appellant.

The judgment is affirmed with damages.